Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAHR LEBBIE, derivatively on behalf of LUCID GROUP, INC. f/k/a CHURCHILL CAPITAL CORPORATION IV, | |
| Plaintiff, | Case No.: |
| v. | |
| PETER RAWLINSON, GLENN AUGUST, ANDREW LIVERIS, and TONY POSAWATZ, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| LUCID GROUP, INC. f/k/a CHURCHILL CAPITAL CORPORATION IV, | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiff Sahr Lebbie ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Lucid Group, Inc. f/k/a Churchill Capital Corporation IV ("Lucid" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendant Glenn August ("August"), for breaches of his fiduciary duties as a director of Lucid, abuse of control, gross mismanagement, and waste of corporate assets, against Peter Rawlinson ("Rawlinson"), Andrew Liveris ("Liveris"), and Tony Posawatz ("Posawatz") (collectively, the "Atieva Defendants," and together with August, the "Individual Defendants"; Individual Defendants together with Lucid, the "Defendants") for aiding and abetting August's breaches of their fiduciary duties as a director of Churchill Capital Corporation IV ("CCIV"), against the Individual Defendants for unjust enrichment, and against Defendant Rawlinson for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lucid, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain officers and directors of two predecessor entities of Lucid from February 5, 2021 through February 22, 2021, both dates inclusive (the "Relevant Period").

2.     Lucid is a Delaware corporation based in Newark, California engaged in the business of developing and commercializing luxury all-electric passenger vehicles. The Company's debut vehicle is called the "Lucid Air."

3.      Lucid, in its current form, results from a July 2021 merger (the "Merger") between Atieva, Inc. d/b/a Lucid Motors ("Atieva"), a start-up electric vehicle manufacturer, and CCIV, a special purpose acquisition company ("SPAC").

4.      Atieva, an exempted company incorporated with limited liability under the laws of the Cayman Islands, was founded in 2007. CCIV was incorporated in Delaware in 2020 for the purpose of raising capital through an initial public offering ("IPO") and effectuating a merger or similar business combination with an existing operating company. CCIV consummated its IPO on August 3, 2020. Pursuant to the Merger in July 2021, Atieva merged with a subsidiary of CCIV, surviving the Merger and becoming a wholly-owned subsidiary of CCIV.

5.      Prior to and throughout the Relevant Period, the Atieva Defendants made, or caused Atieva to make, materially false and misleading statements concerning Atieva's business, operations, and prospects. Specifically, prior to and during the Relevant Period, Defendant Rawlinson and Atieva touted a spring 2021 timetable for Start of Production ("SOP") and customer deliveries of the Lucid Air, purportedly with 6,000-7,000 vehicles to be delivered in 2021.

6.      However, as would later be revealed, Atieva was not reasonably likely to produce cars in the first half of 2021 or to produce 6,000-7,000 vehicles in 2021. The initial customer deliveries of the Lucid Air would not occur until October 30, 2021.

7.      On January 11, 2020, *Bloomberg* published an article revealing that Atieva was in talks to go public via a merger with CCIV.[1] This revelation was widely reported by mainstream news sources and by news organizations catering to investors.[2]

8.      On February 5, 2021, Defendant Rawlinson appeared on a television show called "Squawk on the Street," a stock market-focused program produced by CNBC. During the interview, Defendant Rawlinson stated that Atieva expected to produce 6,000-7,000 units of the of the Lucid Air in 2021. Additionally, Defendant Rawlinson claimed that Atieva had "already built our first phase of our factory

---

[1] https://www.bloomberg.com/news/articles/2021-01-11/lucid-motors-said-to-be-in-talks-to-list-via-michael-klein-spac.

[2] *E.g.*, https://investorplace.com/2021/01/cciv-stock-13-things-to-know-ahead-of-a-potential-lucid-motors-spac-merger/; https://www.reuters.com/article/us-lucid-motors-m-a-klein-idUSKBN29G2HD.

in Arizona, which is good for 34,000 units."

9.     The news of a forthcoming merger between Atieva and CCIV, coupled with misrepresentations regarding the timetable for production and customer deliveries of the Lucid Air, had the effect of misleading the investing public and artificially inflating CCIV's publicly traded securities during the Relevant Period.

10.     On February 22, 2021, Atieva and CCIV issued a press release confirming that they had entered into an agreement to merge (the "Merger Agreement"). The press release referenced an investor presentation on Atieva's website, which was also filed with the SEC. The investor presentation disclosed that Atieva would produce only 577 Lucid Airs in 2021, instead of the 6,000-7,000 previously touted, a decline of approximately 90%. Furthermore, the investor presentation indicated that production would begin in the second half of 2021, instead of spring 2021, as previously announced.

11.     On February 23, 2021, Defendant Rawlinson was interviewed on CNBC, and he stated that "what we need to do now is humbly and diligently execute and get this into production." In a joint call by Atieva and CCIV representatives to discuss the Merger, also held on February 23, 2021, Defendant Rawlinson stated that Atieva was still only "building our pre-production cars," and that production would start "when we get that quality spot on."

12.     The news that Atieva would not produce 6,000-7,000 cars as touted and would begin production in the second half of 2021 instead of in spring 2021 caused CCIV's share price to decline $22.16 per share, or approximately 38%, from its closing price of $57.37 on February 22, 2021, to close at $35.21 per share on February 23, 2021. The share price declined again on February 24, 2021 to a close price of $28.70, representing a loss of approximately 50% over two days.

13.     During the Relevant Period, the Atieva Defendants made and/or caused Atieva to make to the investing public a series of materially false and misleading statements regarding Atieva's business, operations, and prospects. Specifically, the Atieva Defendants willfully or recklessly made and/or caused Atieva to make false and misleading statements that failed to disclose, *inter alia*: (1) Atieva was unable to produce or deliver vehicles in spring 2021; (2) Atieva was not reasonably likely to produce 6,000-7,000 vehicles in 2021; and (3) the true timetable for production and delivery of the Lucid Air. As a result of the

foregoing, Atieva's public statements regarding the Lucid Air were materially false and misleading at all relevant times.

14.    In addition, the Atieva Defendants failed to correct and/or caused Atieva to fail to correct these false and misleading statements and omissions of material fact.

15.    Defendant August knew, or was highly reckless in not knowing, that Atieva's public statements regarding the Lucid Air were materially false and misleading. Moreover, Defendant August knew that the investing public was aware of talks between CCIV and Atieva to merge. However, despite this knowledge, Defendant August willfully or recklessly failed to disclose and/or caused CCIV to fail to disclose, *inter alia*: (1) Atieva was unable to produce or deliver vehicles in spring 2021; (2) Atieva was not reasonably likely to produce 6,000-7,000 vehicles in 2021; (3) the true timetable for production and delivery of the Lucid Air; and (4) CCIV failed to maintain internal controls. Thus, during the Relevant Period, Defendant August breached his fiduciary duties to CCIV by failing to correct or causing CCIV to fail to correct the false and misleading statements issued by Atieva regarding the timetable for the production and delivery of the Lucid Air. The investing public's reliance on the news of the anticipated Merger, and Atieva's or the Atieva Defendants' statements regarding a spring 2021 timetable for the production and delivery of the Lucid Air as well as touted production quantities of 6,000-7,000 vehicles in 2021, caused CCIV's share price to be artificially inflated and harmed CCIV.

16.    In further breach of their fiduciary duties, Defendant August caused CCIV to fail to maintain adequate internal controls.

17.    In light of the Individual Defendants' misconduct—which has subjected Atieva and its Chief Executive Officer ("CEO") to a consolidated securities class action currently pending in the United States District Court for the Northern District of California (the "Securities Class Action") and which has further subjected the Company and its subsidiary Atieva to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company or Atieva and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

18.    The Company and its subsidiary Atieva has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless misconduct.

19.    In light of the misconduct engaged in by the Individual Defendants, five of whom are the Company's current directors, of the collective engagement in fraud and other misconduct by the Company's Director-Defendants (defined below), of the substantial likelihood of the Director-Defendants' liability in this derivative action and of the CEO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

## PARTIES

### Plaintiff

24.    Plaintiff is a current shareholder of Lucid. Plaintiff has continuously held Lucid common stock at all relevant times.

### Nominal Defendant Lucid

25.    Lucid is a Delaware corporation with its principal executive offices at 7373 Gateway

Boulevard, Newark, California 94560. Lucid's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "LCID."

**Defendant Rawlinson**

26.     Defendant Rawlinson served as CEO and Chief Technology Officer ("CTO") of Atieva from April 2019 until the Merger, after which he continued in those roles at Lucid. Defendant Rawlinson currently serves as a member of the Executive Committee. According to the Company's Form S-1/A filed the SEC on August 20, 2021 (the "Amended Registration Statement"), as of July 23, 2021, Defendant Rawlinson beneficially owned 13,127,090 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on July 23, 2021 was $24.25, Defendant Rawlinson owned approximately $318,331,932 worth of Company stock.

27.     Defendant Rawlinson received a $2 million transaction bonus in recognition of his efforts related to the Merger. In addition, Atieva's board of directors approved a special equity grant of 11,293,177 Atieva restricted stock units to Defendant Rawlinson in recognition of his efforts on the Merger and in order to incentivize and align Defendant Rawlinson with the Company's stockholders after the Merger. This award converted into an equivalent award with respect to the Company's common stock after the Merger. Furthermore, according to a prospectus filed by CCIV with the SEC on June 25, 2021 (the "June 25, 2021 Prospectus"), in early April 2021, Atieva sold 202,449 shares of Series E Preferred Shares to Defendant Rawlinson at a purchase price of approximately $7.90 per share, which automatically converted into common shares of Atieva in connection with the Merger and were exchanged for the per share Merger Consideration, which was $10.00 per share.

28.     The Amended Registration Statement stated the following about Defendant Rawlinson:

*Peter Rawlinson.*   Peter Rawlinson has served as our Chief Executive Officer and Chief Technology Officer and director since April 2019. He previously served as Lucid's Chief Technology Officer from 2013 to April 2019. Prior to joining Lucid, Mr. Rawlinson was Vice President of Vehicle Engineering and Chief Engineer of the Model S at Tesla, Inc., where he led the engineering of the Model S from a clean sheet to production readiness while building the engineering team. Mr. Rawlinson was formerly Head of Vehicle Engineering at Corus Automotive, an advanced engineering consulting firm, Chief Engineer of Advanced Engineering at Lotus Cars and Principal Engineer of Advanced Body Structures at Jaguar Cars. Mr. Rawlinson holds a BSc from Imperial College, University of London.

**Defendant August**

29.     Defendant August served as a director of CCIV throughout the Relevant Period and until the Merger, when he became a member of Lucid's Board. He is currently a member of the Audit Committee and the Nominating and Corporate Governance Committee.

30.     The Amended Registration Statement stated the following about Defendant August:

*Glenn R. August.*  Glenn R. August has been a member of our Board since July 2021 and was previously a member of Churchill's board of directors. He is the Founder & Chief Executive Officer of Oak Hill Advisors, L.P. and has overall management responsibility for Oak Hill Advisors. In addition, he serves as global head of the firm's distressed investment activities and chairs or serves on various firm committees, including the partnership, investment strategy and several fund investment committees. He co-founded the predecessor investment firm to Oak Hill Advisors in 1987 and took responsibility for the firm's credit and distressed investment activities in 1990. Mr. August has played leadership roles in numerous restructurings and, since 1987, has served on sixteen corporate boards. He currently serves on the Board of Directors for Churchill Capital Corp V, Churchill Capital Corp VI, Churchill Capital Corp VII and MultiPlan, Inc. Mr. August also serves on the Board of Trustees of Horace Mann School and The Mount Sinai Medical Center, and on the Board of Directors of the Partnership for New York City and the 92nd St. Y. He earned an M.B.A. from Harvard Business School, where he was a Baker Scholar, and a B.S. from Cornell University.

We believe Mr. August is qualified to serve as a director due to his extensive experience overseeing a wide range of public companies and his deep financial knowledge.

**Defendant Liveris**

31.     Defendant Liveris served as a director and Chairman of Atieva throughout the Relevant Period and until the Merger, after which he has served in those roles at Lucid. He is currently Chair of the Compensation Committee and the Executive Committee at Lucid. In addition, Defendant Liveris served as an Operating Partner at CCIV, providing a crucial link between CCIV and Atieva. In 2018, PIF named Defendant Liveris as a special adviser. According to the Amended Registration Statement, as of July 23, 2021, Defendant Liveris beneficially owned 535,275 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on July 23, 2021 was $24.25, Defendant Liveris owned approximately $12.98 million worth of Company stock.

32.     In addition, according to June 25, 2021 Prospectus, in early April 2021, Atieva sold 202,449 shares of Series E Preferred Shares to Defendant Liveris at a purchase price of approximately

$7.90 per share, which automatically converted into common shares of Atieva in connection with the Merger and were exchanged for the per share Merger Consideration, which was $10.00 per share.

33.    The Amended Registration Statement stated the following about Defendant Liveris:

**Andrew Liveris.**  Andrew Liveris has served as chairman of our board of directors since April 2019. Previously, Mr. Liveris served as the Chairman and CEO of The Dow Chemical Company, a chemical corporation, from November 2004 to July 2018 and as the Executive Chairman of DowDuPont Inc., a chemical corporation, from September 2017 to July 2018. Mr. Liveris also serves on the boards of directors of International Business Machines Corp., a technology company, Saudi Arabian Oil Co., an oil exploration company, NOVONIX Limited, a battery materials and technology company, WorleyParsons Limited, an engineering company, and numerous other private companies. He is also on the advisory board of Sumitomo Mitsui Banking Corporation and NEOM, an initiative of Saudi Vision 2030. Mr. Liveris holds a B.S. in Chemical Engineering from the University of Queensland and received an honorary Ph.D. in Science from his alma mater in 2005. Mr. Liveris was appointed as a special advisor to the Public Investment Fund.

We believe Mr. Liveris is qualified to serve as a director due to his decades of experience leading and overseeing large, complex global industrial enterprises, his knowledge of the technology, energy and chemical sectors, and his experience overseeing Lucid's growth as chairman of Lucid's board of directors.

**Defendant Posawatz**

34.    Defendant Posawatz served as a member of Atieva's board of directors from April 2019 until the Merger, after which he has served as a member of Lucid's Board. He is currently a member of the Compensation Committee and the Executive Committee. According to Amended Registration Statement, as of July 23, 2021, Defendant Posawatz beneficially owned 52,880 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on July 23, 2021 was $24.25, Defendant Posawatz owned approximately $1,282,340 worth of Company stock.

35.    For the fiscal year ended December 31, 2020, Defendant Posawatz received $157,895 in total compensation from the Public Investment Fund ("PIF"), the sovereign wealth fund of the Kingdom of Saudi Arabia, for his service as a director of Atieva. In addition, according to June 25, 2021 Prospectus, in early April 2021, Atieva sold 20,000 shares of Series E Preferred Shares to Defendant Posawatz at a purchase price of approximately $7.90 per share, which automatically converted into common shares of Atieva in connection with the Merger and were exchanged for the per share Merger Consideration, which

was $10.00 per share.

36.     The Amended Registration Statement stated the following about Defendant Posawatz:

**Tony Posawatz.** Anthony "Tony" Posawatz has served as a member of our board of directors since April 2019. Mr. Posawatz has also served as President and Chief Executive Officer of Invictus iCAR (innovation Consulting Advisory Resources) LLC, a company focusing on automotive-technology advancement, since August 2013. He formerly led vehicle development of the Chevrolet Volt at General Motors and served as the President and Chief Executive Officer of Fisker Automotive from 2012 to 2013. Mr. Posawatz currently serves a director of Beam Global, a manufacturer and retailer of solar electric vehicle charging stations. He also serves as a board member and advisory board member to numerous private companies. Mr. Posawatz holds a B.S. in Mechanical Engineering from Wayne State University and an M.B.A. from Dartmouth College, Tuck School of Business.

We believe Mr. Posawatz is qualified to serve as a director because of his expertise in electric vehicle and other mobility technologies, his experience bringing electric vehicles to market, his knowledge of the global automotive industry and his experience overseeing Lucid's growth as a member of Lucid's board of directors.

## FIDUCIARY DUTIES OF DEFENDANT AUGUST

37.     By reason of his position as a director of CCIV and because of his ability to control the business and corporate affairs of CCIV, Defendant August owed CCIV and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage CCIV in a fair, just, honest, and equitable manner. Defendant August was required to act in furtherance of the best interests of CCIV, so as to benefit all shareholders equally.

38.     Defendant August owed to CCIV and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of CCIV and in the use and preservation of CCIV's property and assets, and also owed the highest obligations of fair dealing.

39.     Defendant August, because of his position of control and authority as a directors of CCIV, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     To discharge his duties, Defendant August was required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of CCIV.

41.     Defendant August, by virtue of his position as a director, owed to CCIV and its

9

shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of CCIV, as well as in the use and preservation of corporate property and assets. The conduct of Defendant August complained of herein involves a knowing and culpable violation of his obligations as a director of CCIV, the absence of good faith on his part, or a reckless disregard for his duties to CCIV and its shareholders that he was aware or should have been aware posed a risk of serious injury to CCIV.

42.     As a director of CCIV, a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, Defendant August had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to CCIV's financial conditions, performance, growth, operations, financial statements, businesses, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding CCIV's business, prospects, and operations, and had a duty to cause the CCIV to disclose in regulatory filings with the SEC all those facts described in this Complaint that CCIV failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, he had a duty to ensure the Company remained in compliance with all applicable laws.

43.     To discharge his duties, Defendant August was required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of CCIV. By virtue of such duties, he was required to, among other things:

(a)     ensure that CCIV was operated in a diligent, honest, and prudent manner in accordance with applicable laws and regulations, including but not limited to those of Delaware, California, and the United States, and pursuant to the CCIV's own corporate governance documents, including applicable codes of business conduct and ethics;

(b)     conduct the affairs of CCIV in an efficient, business-like manner so as to make it possible to provide the highest quality performance CCIV's business, to avoid wasting corporate assets, and to maximize the value of CCIV's publicly-traded stock, as applicable;

(c)     remain informed as to how CCIV conducted its operations, and, upon receipt of

notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)       establish and maintain systematic and accurate records and reports of the business and internal affairs of CCIV and procedures for the reporting of the business and internal affairs to the board of directors of CCIV and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)       maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CCIV's operations would comply with all applicable laws and any financial statements and regulatory filings filed with the SEC and disseminated to the public and/or to shareholders would be accurate;

(f)       exercise reasonable control and supervision over the public statements made by, about, or concerning the officers and employees of CCIV and any other reports or information required by law to be disseminate by CCIV;

(g)       refrain from unduly benefiting himself and other corporate insiders at the expense of CCIV; and

(h)       examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of CCIV and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.       Defendant August further owed to CCIV and the shareholders thereof the duty of loyalty requiring that he favor CCIV's interest and that of its shareholders over his own while conducting the affairs of CCIV and refrain from using his position, influence, or knowledge of the affairs of CCIV to gain personal advantage.

45.       At all times relevant hereto, Defendant August was an agent of CCIV, and was at all times acting within the course and scope of such agency. Furthermore, the Individual Defendants were the agents of each other to the extent of the scheme described herein, which had the effect of artificially inflating CCIV's stock price.

46.       Because of their advisory, executive, managerial, directorial, and controlling positions with

CCIV or Atieva, each of the Individual Defendants had access to adverse, nonpublic information about CCIV and Atieva, including but not limited to information regarding the production of the Lucid Air.

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused CCIV and/or Atieva to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise Defendant August's violations of law, including breaches of fiduciary duty, waste of corporate assets, gross mismanagement, abuse of control, the Atieva Defendants' aiding and abetting of the foregoing, as well as the Individual Defendants' unjust enrichment; (ii) conceal adverse information concerning CCIV's and Atieva's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the stock price of CCIV.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Atieva and CCIV purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of CCIV's board of directors and were aided and abetted by Atieva's board of directors, each of the Individual Defendants who was a director of said boards of directors was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the

wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

52.     At all times relevant hereto, the Individual Defendants were the agents of each other and Defendant August was the agent of CCIV, and the Individual Defendants were at all times acting within the course and scope of such agency. Furthermore, the Individual Defendants were the agents of each other to the extent of the scheme described herein, which had the effect of artificially inflating CCIV's stock price.

## CCIV'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### CCIV's Code of Conduct and Ethics

53.     CCIV's Code of Conduct and Ethics (the "Code of Conduct") states in its introduction as follows:

> The Company requires the highest standards of professional and ethical conduct from its employees, officers and directors. Our reputation for honesty and integrity is key to the success of its business. The Company intends that its business practices will comply with the laws of all of the jurisdictions in which it operates and that honesty, integrity and accountability will always characterize the Company's business activity. No employee, officer or director may achieve results through violations of laws or regulations or unscrupulous dealings.

> This Code reflects the Company's commitment to this culture of honesty, integrity and accountability and outlines the basic principles and policies with which all employees, officers and directors are expected to comply. Therefore, we expect you to read this Code thoroughly and carefully.

54.     In a section titled "Conflicts of Interest," the Code of Conduct provides as follows, in pertinent part:

> A conflict of interest occurs when your private interest interferes, appears to interfere or is inconsistent in any way with the interests of the Company. For example, *conflicts of interest may arise if:*

> You cause the Company to engage in business transactions with a company that you, your friends or your relatives control without having obtained the appropriate prior approvals required.

> *You are in a position to* (i) compete with, rather than help, the Company or (ii) *make a*

13

***business decision not on the basis of the Company's interest but rather for your own personal advantage.***

You take actions, or have personal or family interests, which may make it difficult to perform your work (or discharge your duties and obligations) effectively.

You, or any of your family members or affiliates, receive improper personal benefits other than gratuities and payments received or provided in compliance with the guidelines set forth in "Gifts and Entertainment" below, as a result of your position in the Company.

(Emphasis added.)

55.     In a section titled "Public Reporting," the Code of Conduct provides as follows:

Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders.

***Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines:***

all accounting records, and the reports produced from such records, must comply with all applicable laws;

all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;

all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;

accounting records must not contain any false or intentionally misleading entries;

no transactions should be intentionally misclassified as to accounts, departments or accounting periods;

all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;

no information should be concealed from the internal auditors or the independent auditors; and

***compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.***

(Emphasis added.)

56.     In section titled "Fair Dealing," the Code of Conduct provides as follows:

Each employee, officer and director, in carrying out his or her duties and responsibilities, should endeavor to deal fairly with each other and the Company's customers, suppliers and competitors. ***No employee, officer or director should take unfair advantage of anyone through*** illegal conduct, manipulation, concealment, abuse of privileged information, ***misrepresentation of material facts or any other unfair-dealing practice.***

(Emphasis added.)

### *Audit Committee Charter*

57.     CCIV's Audit Committee Charter states that the Audit Committee shall provide assistance to CCIV's board of directors in fulfilling its legal and fiduciary obligations to oversee the following:

the integrity of the financial statements and other financial information provided by the Company to its stockholders, the public, any stock exchange and others;

the Company's compliance with legal and regulatory requirements;

the qualifications and independence of the Company's independent auditor;

the performance of the Company's internal audit function and its system of internal controls and independent auditor, and

such other matters as are assigned to the Committee by the Board pursuant to this Charter or as mandated under applicable laws, rules and regulations (including the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, as amended (the "Exchange Act")) as well as listing standards of the New York Stock Exchange (together, the "Applicable Requirements").

58.     With respect to CCIV's internal audit function and internal controls, the Audit Committee Charter provides that the Audit Committee shall:

Review, based on the recommendation of the Company's independent auditor and the person responsible for the Company's internal audit group, the scope and plan of the work to be done by the internal audit group and the responsibilities, budget, audit plan, activities, organizational structure and staffing of the internal audit group as needed.

Receive reports from the internal audit group on the status of significant findings and recommendations, and management's responses.

Review on an annual basis the performance of the internal audit group.

In consultation with the Company's management, independent auditor and the internal audit group, review the adequacy of the Company's internal controls, disclosure processes and its procedures designed to ensure compliance with laws and regulations, and any

special audit steps adopted in light of material control deficiencies.

Review (a) the internal control report prepared by management, including management's assessment of the effectiveness of the Company's internal control over financial reporting and (b) the Company's independent auditor's attestation, and report, on the assessment made by management, in each case, as and when required by Section 404 of the Sarbanes-Oxley Act of 2002. Discuss with management, the internal audit group and the independent auditor any changes
in internal control over financial reporting disclosed or considered for disclosure in the Company's periodic filings with the SEC.

Review with management and the Company's independent auditor any reports or disclosure submitted by management to the Committee as contemplated by the certifications required under Section 302 of the Sarbanes-Oxley Act of 2002.

Review with management any management letters and the steps management intends to take to address the issues raised by those letters.

59.     Defendant August violated the Code of Conduct, CCIV company policy, and CCIV's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public or to fail to correct false and misleading statements regarding or concerning CCIV, and by disguising his violations of law, including breaches of fiduciary duty, waste of corporate assets, abuse of control, gross mismanagement, the aiding and abetting thereof by the Atieva Defendants, and the unjust enrichment of the Individual Defendants, as well as failing to report the same. Further in violation of the Code of Conduct and the Company's policies, the Defendant August failed to maintain internal controls, failed to maintain the accuracy of CCIV records and reports, and failed to comply with applicable laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

60.     Lucid is a Delaware corporation based in Newark, California engaged in the business of developing and commercializing luxury all-electric passenger vehicles. The Company's debut vehicle is called the "Lucid Air." The Company is the result of the Merger between Atieva, a nascent automobile manufacturer, and CCIV, a SPAC.

61.     Prior to the Merger, CCIV's units, common stock, and warrants traded on the New York Stock Exchange. In connection with the Merger, CCIV changed its name to Lucid Group, Inc. The

Company's common stock now trades on the NASDAQ.

62. Throughout the Relevant Period, the Atieva Defendants caused Atieva to repeatedly tout that production and customer deliveries of the Lucid Air would begin spring 2021 and that Atieva would produce 6,000-7,000 vehicles in 2021, while failing to disclose the actual timetable for production and customer deliveries of the vehicle.

63. As would later be revealed, the Company was not reasonably likely to produce 6,000-7,000 cars in 2021 or to produce cars in the first half of 2021. The initial customer deliveries of the Lucid Air would not occur until October 30, 2021.

64. Defendant August knew, or was highly reckless in not knowing, that the Atieva's or the Atieva Defendants' statements to the effect that production and delivery of the Lucid Air would occur in spring 2021 or would amount to 6,000-7,000 vehicles in 2021 lacked a reasonable basis. Moreover, Defendant August knew, or was highly reckless in not knowing, that the investing public was aware of talks between CCIV and Atieva to merge. Thus, during the Relevant Period, Defendant August breached his fiduciary duties to CCIV by failing to correct the false and misleading statements issued by Atieva regarding the timetable for the production and delivery of the Lucid Air, a material issue to CCIV investors given the forthcoming Merger. The investing public's reliance on the news of the anticipated Merger and the oft-repeated spring 2021 timetable for the production and delivery of the Lucid Air caused CCIV's share price to be artificially inflated.

65. The Atieva Defendants aided and abetted Defendant August's breaches of fiduciary duties.

**Engineer Tom Bryant Describes Pertinent Manufacturing Practices**

66. Counsel in the Securities Class Action have retained the services of Tom Bryant, a licensed Professional Engineer ("P.E.") with expertise in the automotive industry, manufacturing engineering, plant engineering, supply chain, worldwide logistics, supplier development, and product development. Mr. Bryant was a co-architect of General Motors' Global Purchasing and Supply Chain process. The information in this section is derived from class counsel's descriptions of Mr. Bryant's opinions.

67. Mr. Bryant described the term SOP, or Start of Production, in detail to class counsel. Specifically, according to class counsel's interviews with Mr. Bryant, the term SOP is a well-understood

industry term synonymous with "Product Launch."

68.     According to Mr. Bryant's discussions with counsel in the Securities Class Action, references to a factory facility being "completed" or being "already built" indicates that the factory is ready for SOP. According to Mr. Bryant, a factory cannot be regarded as "already built" unless the factory and its production processes are ready for the SOP phase.

69.     Further according to Mr. Bryant's discussion with counsel in the Securities Class Action, when the term "already built" is coupled with an indication that the facility is "fully commissioned," the term "already built" is clearly intended to be used in its ordinary, well recognized sense. According to Mr. Bryant, facility commissioning is the period between plant construction and SOP. Commissioning is a vital step, and its purpose is to confirm that the facility is safe, efficient, and ready to begin the manufacturing operation. In other words, according to Mr. Bryant, commissioning is the planned coordination and execution of the final stages of construction in the beginning of production. Specifically, commissioning typically falls within three steps: (1) Pre-commissioning; (2) Commissioning; and (3) Startup or SOP. According to Mr. Bryant's discussions with class counsel, "fully commissioned" means, without question, that the facility is ready for SOP.

**Atieva Repeatedly Touted "Spring 2021" Timetable for Production and Delivery of Lucid Air**

70.     In a series of press releases issued prior to the beginning of the Relevant Period, Atieva repeatedly touted a Spring 2021 timetable for the production and delivery of the Lucid Air.

***October 2, 2020 Press Release***

71.     On October 2, 2020, Atieva issued a press release titled "Lucid Motors Opens Studio & Service Center in Beverly Hills." The press release stated: "Having recently unveiled the Lucid Air Dream Edition, ***production of which will start in Spring of 2021***, that car takes center stage at the Beverly Hills Studio, with customers able to review options for the full Lucid Air lineup of luxury, high-performance EVs [Electric Vehicles]." (Emphasis added.)

72.      The press release also stated the following in a section titled "About Lucid Motors":

Lucid's mission is to inspire the adoption of sustainable transportation by creating the most captivating electric vehicles, centered around the human experience. The company's first car, the Lucid Air, is a state-of-the-art luxury sedan with a California-inspired design

underpinned by race-proven technology. Featuring luxurious interior space in a mid-size exterior footprint, the Air will be capable of an estimated EPA range of over 500 miles and 0-60 mph in under 2.5 seconds. ***Customer deliveries of the Lucid Air, which will be produced at Lucid's new factory in Casa Grande, Arizona, will begin in the spring of 2021.***

(Emphasis added.)

### *October 14, 2020 Press Release*

73.     On October 14, 2020, Atieva issued a press release titled "Lucid Motors Expands Luxury EV Lineup with Its Most Attainable Lucid Air Model Yet, Featuring 406 Miles of Range and 480 horsepower from just $69,900; Reservations Now Open for All Lucid Air Models."

74.     The press release stated the following regarding customer deliveries of the Lucid Air:

Reservations for Lucid Air and Lucid Air Touring, as well as the other models in the Lucid Air range, are open now and can be placed at the Lucid Motors website or at an ever-expanding network of retail locations, including the recently opened Beverly Hills Studio and service center. ***Customer deliveries for the first Lucid Air models begins in spring of 2021.***

 (Emphasis added.)

75.     The press release also stated the following in a section titled "About Lucid Motors":

Lucid's mission is to inspire the adoption of sustainable transportation by creating the most captivating electric vehicles, centered around the human experience. The company's first model range, the Lucid Air, is a state-of-the-art luxury sedan with a California-inspired design underpinned by race-proven technology. Featuring luxurious interior space in a mid-size exterior footprint, certain models of the Air will be capable of an estimated EPA range of over 500 miles and 0-60 mph in under 2.5 seconds. ***Customer deliveries of the Lucid Air Dream Edition, which will be produced at Lucid's new factory in Casa Grande, Arizona, will begin in the spring of 2021.***

(Emphasis added.)

### *November 5, 2020 Press Release*

76.     On November 5, 2020, Atieva issued a press release titled "Lucid Motors Expands California Studios with New Locations in Century City and San Jose."

77.     The press release stated the following regarding production of the Lucid Air:

Lucid Motors, which seeks to set new standards for sustainable mobility with its advanced luxury EVs, today announced the imminent opening of its Century City and San Jose Studio locations. While there, ***customers can see the Lucid Air, which starts production in Spring 2021 with the exclusive Dream Edition***, and they can also design and reserve a Lucid Air of their own.

(Emphasis added.)

78.     The press release also stated the following in a section titled "About Lucid Motors":

Lucid's mission is to inspire the adoption of sustainable transportation by creating the most captivating electric vehicles, centered around the human experience. The company's first car, the Lucid Air, is a state-of-the-art luxury sedan with a California-inspired design underpinned by race-proven technology. Featuring luxurious interior space in a mid-size exterior footprint, the Air will be capable of an estimated EPA range of over 500 miles and 0-60 mph in under 2.5 seconds. ***Customer deliveries of the Lucid Air, which will be produced at Lucid's new factory in Casa Grande, Arizona, will begin in the spring of 2021.***

(Emphasis added.)

***December 1, 2020 Press Release***

79.     On December 1, 2020, Atieva issued a press release titled "Lucid Motors Completes Construction on First Greenfield Electric Vehicle Factory in North America." The press release also contained the subtitle, "Commissioning Process Underway for ***Spring 2021 Production Start of Lucid Air.***" (Emphasis added.)

80.     The press release stated the following regarding production of the Lucid Air:

Lucid Motors, which is setting new standards for sustainable mobility with its advanced luxury EVs, today announced completion of the first phase of construction at the new Lucid AMP-1 (Advanced Manufacturing Plant) factory in Casa Grande, AZ, with the commissioning of production equipment and processes underway ahead of ***start of production for Lucid Air in Spring of 2021.***

(Emphasis added.)

81.     Referring to Atieva's manufacturing plant in Casa Grande, Arizona, the press release also stated "***[c]ustomer-ordered production cars will start coming off the Arizona line in Spring of 2021, with an initial capacity of up to 30,000 units annually*** to supply global markets, beginning with North America." (Emphasis added.)

***December 17, 2020 Press Release***

82.     On December 17, 2020, Atieva issued a press release titled "Lucid Motors Expands Retail Locations in the US with First East Coast Studios in South Florida."

83.     The press release stated that "Lucid Air production begins in Spring 2021 at the newly completed Lucid Advanced Manufacturing Plant (AMP-1) in Casa Grande, Arizona."

84. The press release also stated the following in a section titled "About Lucid Motors":

Lucid's mission is to inspire the adoption of sustainable energy by creating the most captivating electric vehicles, centered around the human experience. The company's first car, the Lucid Air, is a state-of-the-art luxury sedan with a California-inspired design underpinned by race-proven technology. Featuring luxurious interior space in a mid-size exterior footprint, select models of the Air will be capable of an estimated EPA range of over 500 miles and 0-60 mph in under 2.5 seconds. ***Customer deliveries of the Lucid Air, which will be produced at Lucid's new factory in Casa Grande, Arizona, will begin in the spring of 2021.***

(Emphasis added.)

**Market Learns of Merger at the Beginning of the Relevant Period**

85. News of the forthcoming Merger between CCIV and Atieva was widely reported throughout the Relevant Period.

86. On January 11, 2020, *Bloomberg* published an article revealing that Atieva was "in talks to go public through a merger with one of Michael Klein's special purpose acquisition companies, according to people familiar with the matter."[3] CCIV is one of Michael Klein's SPACs. The revelation regarding these talks was quickly picked up by other news organizations. On the same day, January, 11, 2020, *Reuters* published an article titled "EV firm Lucid Motors in talks to go public via SPAC deal – Bloomberg News."[4] In addition to reiterating *Bloomberg*'s findings, the *Reuters* article provided as follows, in pertinent part: "In a statement, Lucid said it has always been clear about its intent to go public at some point and added that ***its focus remains on bringing its first luxury model, the Lucid Air, to production in spring.***" (Emphasis added.)

87. News organizations catering to investors also covered the news. For instance, also on January 11, 2021, *Investorplace.com* published an article titled "CCIV Stock: 13 Things to Know Ahead of a Potential Lucid Motors SPAC Merger."[5]

88. CCIV would later confirm in the June 25, 2021 Prospectus that, on January 11, 2021, financial advisors of Atieva and Defendant Michael Klein held a telephone call during which they

---

[3] https://www.bloomberg.com/news/articles/2021-01-11/lucid-motors-said-to-be-in-talks-to-list-via-michael-klein-spac

[4] https://www.reuters.com/article/us-lucid-motors-m-a-klein-idUSKBN29G2HD

[5] https://investorplace.com/2021/01/cciv-stock-13-things-to-know-ahead-of-a-potential-lucid-motors-spac-merger/

discussed the possibility of a business combination between CCIV and Atieva.

89.     On January 12, 2021, CCIV CEO Michael Klein participated in an interview with John Jannanore from the news company *IPO Edge*. Jannanore opened the interview by stated, "I have to address an elephant in the room, I have received emails from no fewer than 50 or 60 of you asking about a specific news report from BLOOMBERG yesterday, I just spoke to Michael [Klein] and unfortunately he is in a difficult position and cannot address that at all." This statement conveyed to investors that CCIV was likely to acquire Atieva.

90.     Throughout the Relevant Period, evidence grew that CCIV and Atieva would merge. On January 14, 2021, *Business Insider* published an article titled "Churchill Capital Corp IV has surged 80% in just 4 days amid Lucid Motors merger talks."[6] The article stated, in pertinent part:

> Churchill Capital Corp IV is continuing its meteoric rise on Thursday. Shares have surged over 80% in four days since investors first heard news the special purpose acquisition company may take the EV startup Lucid Motors public.
>
> Now, Lucid has listed jobs like Director of Investor Relations and SEC Reporting Manager on its website's careers page, ***lending more credence to the news the company intends to go public via a merger with Churchill.***

(Emphasis added.)

91.     On January 22, 2021, the *Los Angeles Times* published an article titled "Lucid Motors prepares to go public thanks to Saudi money and SPAC mania."[7] Citing "a source familiar with the negotiations," the *Los Angeles Times* described the deal between Atieva and CCIV as "***near completion.***" (Emphasis added.) The article also stated that, "[i]f the deal goes off without a hitch, ***Lucid executives and board members — including Chairman Andrew Liveris, a former Dow Chemical chief executive with deep financial ties to Saudi Arabia — would get a shot at a big payday.***" (Emphasis added.)

92.     The wide reporting of the Merger throughout the Relevant Period, in conjunction with Atieva's repeated statements to the effect that production and customer deliveries of the Lucid Air would begin in spring 2021, caused CCIV's stock price to soar to close at $57.37 per share on February 22, 2021.

---

[6] https://markets.businessinsider.com/news/stocks/churchill-capital-corp-iv-stock-price-surged-amid-lucid-motors-merger-talks-2021-1
[7] https://www.latimes.com/business/story/2021-01-22/lucids-chairman-plays-both-sides-of-blank-check-ipo-deal-with-deep-ties-to-saudi-arabia

**Confidential Witnesses Describe Lucid's Lack of Production Capabilities**

93.     According to confidential witnesses interviewed by counsel in the Securities Class Action, Atieva's factory was not functional, the Lucid Air was not fully designed, and Atieva was facing production delays that caused Atieva's production start date to be pushed back.

94.     **CW1.** Counsel in the Securities Class Action interviewed a Logistics Operations Supervisor who worked at Atieva from July 2020 to December 2020 ("CW1"). CW1 was responsible for supervising a logistics operations team at Atieva's Arizona plant. CW1 reported to Operations Manager David Tasker and Senior Logistics Manager Craig Watson, both of whom reported to Vice President of Global Supply Chain Peter Hasenkamp, who reported to Defendant Rawlinson. CW1 worked primarily out of the Casa Grande location and Atieva's Tempe, Arizona facility. According to CW1, when he[8] heard about media interviews where Defendant Rawlinson claimed Atieva would have a large rollout of vehicles in the first half of 2021, CW1 "knew it wasn't going to happen." CW1 stated to class counsel that Atieva's inability to meet the publicly touted production schedule was openly discussed at meetings attended by Tasker, Watson, and Greg Henninger, Atieva's Director of Global Logistics. CW1 further stated that, during his tenure at Atieva, the entire work force knew that Atieva would not meet production goals as touted by Defendant Rawlinson in media appearances.

95.     According to interviews conducted by class counsel, CW1 recalled that Atieva was behind schedule, running low on funding, and concerned about the ability to purchase basic equipment. He further stated that Atieva's facility was never capable of actually producing vehicles. CW1 stated that Atieva experienced significant production delays and material shortages, and Atieva was way behind its vehicle production schedule. He further explained that, during his tenure, at one point the production schedule reflected a SOP date of April 2021, but that this date was moved to October 2021 because Atieva could not meet earlier targets. He also stated that Atieva's Casa Grande production facility lacked a functioning inventory tracking system, a basic aspect of a production facility, and that employees wasted time by searching for parts. CW1 further reported that the car displayed at the Casa Grande launch event was

---

[8] Confidential witnesses interviewed by counsel in the Securities Class Action ("CWs") are referred to with masculine pronouns regardless of their gender.

constructed by hand in California, meaning that the vehicle was not constructed at Atieva's Arizona facility.

96.     In interviews of CW1 by class counsel, CW1 explained how an important benchmark in Atieva's dealings with Saudi investors was that Atieva's Casa Grande facility be operational by July 1, 2020. Although the planned in-person visit did not occur, CW1 relayed that his team spent weeks importing vehicles in different stages from California to the Tempe, Arizona facility and staged a production to make it look like they were assembling vehicles, which were in fact non-operational. CW1 stated that this video was shown to Saudi investors for a zoom meeting that took place instead of the planned in-person meeting. CW1 stated that he and his team spent two days disassembling the phony production line and returning parts to their original places. CW1 stated that, while Nikola was in the news for fraudulent practices, he and his colleagues would state that they were no different than Nikola.

97.     In interviews with class counsel, CW1 stated that even after the Casa Grande facility was supposed to be operational, Atieva could not gain approval for the fire suppression system from the local fire marshall. CW1 recounted how many logistics employees walked around during construction carrying fire extinguishers in case a fire erupted. CW stated that the team was therefore operating illegally and was "kicked out" of the facility by the fire marshall, which delayed the ability to build vehicles for crash testing.

98.     CW1 stated in interviews with class counsel that Atieva rented a body shop in a run-down neighborhood of Casa Grande and shipped unmarked vehicles there for assembly. CW1 recalled finding an Atieva senior manager arguing with the auto body shop proprietor, and that the proprietor demanded more money once he realized Atieva did not want anyone to know of its covert body shop production. CW1 further stated that Atieva used the body shop for approximately two months and built six cars again, until the fire marshall permitted Atieva to use the Casa Grande facility, which was still not fully functional. Class counsel contacted the body shop to inquire regarding the allegations, but the body shop representative responded that he would not answer any questions because he had signed a non-disclosure agreement, a fact which corroborates CW1's statements to class counsel. CW1 also stated that the fire marshall also shut down the other Casa Grande power-train facility where some components were being

assembled. CW1 stated that when he resigned from Atieva, the power-train facility was still not operational.

99.     In interviews with class counsel, CW1 also stated that Defendant Rawlinson's claims to the media did not align with discussions in internal meetings. CW1 stated that he and his colleagues laughed when Defendant Rawlinson touted a rollout of 6,000 vehicles in the first half of 2021 to the media because, according to CW1, "we were just in a meeting where we said we couldn't go into production." CW1 explained to class counsel that during these meetings, participants discussed raw materials and parts shortages, crash tests behind schedule, production facility delays, construction delays, the need to outsource parts and labor, and other issues. CW1 reiterated that the stated goal of 6,000 cars in 2021 was unrealistic and there was "no way" that it could be met. He stated that "we all knew" that Atieva would not meet its 2021 production goals.

100.     Critically, CW1 further relayed to class counsel that he participated in internal Zoom meetings with Rawlinson at least once a month where the production delays were discussed. CW1 stated that, in addition to the weekly logistics meetings that he attended, Defendant Rawlinson hosted weekly all-hands meetings via Zoom, and that there was no way Rawlinson did not know about the production delays. CW1 added that Hasenkamp reported directly to Defendant Rawlinson and attended weekly logistics meetings, where delays were frequently discussed. According to CW1's statements to class counsel, Defendant Rawlinson and the rest of senior management "absolutely knew" they were behind schedule and this fact was openly discussed at weekly meetings. CW1 specifically recalled that battery delays were discussed during those meetings, and that Defendant Rawlinson and Hasenkamp took part in multiple walk-throughs of the Casa Grande facility.

101.     **CW2.** Class counsel in the Securities Class Action also contacted a Senior Engineer who worked at Atieva from January 2020 to April 2021 ("CW2"). He reported to Wulfer de Bruijn, Senior Technical Specialist Efficiency and Systems, and Emad Dlala, a Technical Fellow and Senior Staff Engineer. De Bruijn reported to Dlala, and Dlala reported to Defendant Rawlinson. CW2 was a test engineer at Atieva who conducted driving tests on prototypes of Atieva's car and later a "production

representative" of the car. CW2 was a test engineer who conducted driving tests on prototypes and later on a "production representative" of the car.

102.    According to class counsel's interviews with CW2, CW2's responsibilities included obtaining EPA-required homologation tests (required to obtain necessary vehicle certifications) and certifications for the Monroney label (a required label or sticker displayed on new automobiles that displays information about fuel economy and other mandatory disclosures). As part of these responsibilities, CW2 prepared a highly detailed time schedule, described as a "Gantt chart," which has several rows that each reflect a task needed to be done as part of the process, with a start and finish date for each task. CW2 stated that he had this entire schedule built out for the cars that his team would be testing and preparing for official EPA tests. CW2 added that the schedule depended on other factors falling into place, including the delivery date of cars so he could begin testing them. CW2 stated that he updated the schedule on a weekly, daily, and even an hourly basis, which could alter the completion date. CW2 stated that by about January and February 2021, his scheduled showed that Atieva would not be able to complete the EPA homologation testing and obtain the EPA's certification required for the Monroney label before the end of June.

103.    In interviews with class counsel, CW2 stated that he provided his schedule to his boss de Bruijn, and that Dlala was also aware of the schedule. CW2 added that "a lot of people" had access to his schedule and that Dlala asked him to create a "boiled down" version of the schedule for Defendant Rawlinson.

104.    In interviews with class counsel, CW2 stated that in January and February 2021, he still only had prototypes of the car to test, which was, at that point, the Beta 2 version. CW2 stated that these prototypes were built by hand in Newark, CA — not at the Arizona production facility. CW2 further stated that both Beta-1 and Beta-2 were built in Newark, California and not at the Arizona production facility.

105.    In interviews with class counsel, CW2 stated that in January and February 2021, he did not yet have what he called "production representative" cars from the Arizona factory, which were cars produced by the production line and which were basically the cars that would be sold to the public. CW2 stated that he could not start the final preparations for the official EPA homologation tests and

certifications required by federal law until he had the production representative cars on which to run the tests. CW2 stated that he did not receive his three production representative cars until early-to-mid-March 2021, which all added significant quality problems. CW2 stated that "[a]ll three of them were terrible," and "[t]he quality was unsellable. The quality was horrible."

106.    In interviews with class counsel, CW2 stated that before he could run his own pre-tests on the cars, his team of technicians had to do major work to make the cars capable of being tested accurately. CW2 stated that he "had a team of technicians that went through the entire car to make it more production representative," adding that the body panels were not aligned at all and window seals were not sealing. CW2 further added that the first cars he received had to be completely rebuilt and that, as one example of problems with the cars, the very first car was 8-millimeters too wide.

107.    **CW4**. Counsel in the Securities Class Action also interviewed a confidential witness who was employed as a Senior Technical Program Manager from September 2020 to September 2021 ("CW4").[9] CW4 reported to Marvin Riley, Engineering Manager – Vehicle Testing, and Roger Evans, Senior Director Vehicle Development. Riley reported to Evans, who in turn reported to Eric Bach, SVP and Chief Engineer, and Bach reported to Defendant Rawlinson. CW4 worked out of the Newark, California headquarters and was also out in the field at testing facilities. He occasionally visited the Arizona manufacturing facilities.

108.    Regarding the claims that Atieva would deliver its first cars in Spring 2021 and produce 6,000 cars in 2021, CW4 stated to class counsel that he and all of his co-workers knew it was impossible and could not happen, adding "there was just no way." He further stated that "I just knew there was no way they would do 6,000 cars in 2021," and that "the car wasn't ready. It wasn't even close." CW4 stated that everyone knew these claims were impossible. When asked if Defendant Rawlinson was told by his employees prior to February 22, 2021, that it would be impossible to deliver the first cars in Spring and make 6,000 cars in 2021, CW4 said yes. CW4 said that he was on calls where Defendant Rawlinson was told, prior to February 22, 2021, that it would be impossible to deliver the first cars in Spring and make 6,000 cars in 2021. CW4 further stated that "we said there was no way." CW4 stated that Atieva's

[9] References to CW3 are intentionally omitted.

leadership "absolutely" knew, prior to announcing the merger on February 22, 2021, that delivering cars by Spring and producing 6,000 cars in 2021 was not possible.

109.    CW4 further stated in interviews with counsel in the Securities Class Action that information was relayed to top leadership during meetings, in reports, and on projection charts that showed that obviously the Spring SOP would not be possible. According to CW4, these reports included "supplier projections, tooling projections, software projection – none of that would line up" with hitting a Spring SOP. CW4 stated, "The dates would box with the Spring SOP date." CW4 said that achieving the Spring SOP was "not even close" and that it was "just impossible." He further recalled that the plant "could not even" produce the correct battery and electric motor by that time, and that the motor "was not fully validated" since it was still going through "design changes." CW4 stated that "everything was lining up with late December 2021 or early 2022" in terms of a real "SOP where you deliver a car to customers."

110.    Class counsel asked CW4 whether this timeline was communicated to Defendant Rawlinson, and CW4 responded, "oh god yeah. He knew what was going on." CW4 added that Peter Hasenkamp, Vice President of Global Supply Chain and Operations, and Peter Hochholdinger, Vice President of Global Manufacturing reported to top management, including Defendant Rawlinson, that the Company would not meet a Spring SOP. CW4 stated that he sat in meetings with both Hasnkamp and Hochholdinger when the conversations concerning the unreachable Spring SOP took place. CW4 also recalled that Vice President of Software, Electronics, UX and IT Vince Nakayama was also present in those meetings, as were others.

111.    According to class counsel's interviews with CW4, CW4 stated that "If they would have said, '[Delivery by] March of 2022,' no one would blink. We'd have to push for that, but it could happen." CW4 confirmed that Spring 2021 for delivery and 6,000 cars in 2021 was impossible.

112.    In interviews with class counsel, CW4 stated that "There were a whole bunch of systems that no way could meet the Spring SOP date." CW4 stated that in January and February 2021, the Company was still working with the Beta 2 version of the car and that "The Beta 2s were so far away from the production [version] it just wasn't feasible, the tooling, the production, it was so far away." He added that the Beta-2s "did not even have a working motor and battery combination" at that time and by February

2021, the "Beta-2 cars did not even have real interiors. They didn't have doors, door handles—any of that stuff."

113.   CW4 further stated in interviews with class counsel that in January and February 2021, Atieva engineers were still working on developing the car that would ultimately be produced and many decisions had not yet been made. CW4 added that the motor and configurations were changing at the time and that "some of the internals of the motors were changing." CW4 stated that at the time, engineers had not even decided on what battery pack to use in the car. CW4 was aware that at the time, engineers had not even decided on what battery pack to use in the car. CW4 was aware of the ongoing changes because his team was running tests on the different combinations of the parts and motors. CW4 further stated that the changes continued through the Spring and into the Summer. CW4 recalled that a decision had not yet been made about the car's electric motors, and that no one knew how the tooling would impact the car's exterior, and the mechanism for how the doors opened and closed wasn't finalized. CW4 stated, "None of the systems were fully operational."

114.   In interviews with class counsel, CW4 stated that in January and February, "There were so many unknowns at that time." CW4 clarified that there were many aspects of the car that had not been completed. CW4 recalled as an example how the original doors were supposed to be motorized but they were not working so they had to be changed to regular doors. CW4 stated that this change alone "would take until August [2021] for a pre-production car." Another example was unresolved issues with different aspects of the Advanced Driver Alert System ("ADAS") that did not meet safety regulations, such as the reverse camera not working. He added that Atieva knew it was not going to have a functioning reverse camera until August 2021.

115.   CW4 stated to class counsel that "there were so many issues. Not little things to fix. These were big things." CW4 stated that once a car is finalized and obtains all the tests and certifications needed to produce it, delivering cars to the public is still a long way off. CW4 stated that "you have a ramp rate, and they were nowhere near that." CW4 also stated that certifications to sell the car were not obtained until September 2021.

116.    CW4 further stated to class counsel that Atieva knew by February 2021 that crash and safety testing, which is required by the National Highway Transportation Safety Administration, was not going to be done in time to hit the Spring SOP. CW4 stated that the ADAS and infotainment systems were also many months off from production-ready in early 2021, adding that "They all knew they didn't have time, that it (the car) wouldn't be ready" for a Spring SOP, referring to Atieva management and executives. CW4 stated that "They knew it wouldn't be ready for at least six to nine months. That was best case scenario. CW4 further stated that Atieva was "so far behind in software."

117.    CW4 stated to class counsel that in mid-February and prior to February 22, 2021, the Arizona production facility was far from ready to start production on cars for the public. CW4 stated that the plant wasn't ready and that "They didn't have staffing (at the plant). There was just no way. Nothing was built up for that."

118.    **CW5.** Counsel in the Securities Class Action also interviewed an individual employed by Atieva from August 2020 to mid-December 2020 in the General Assembly Department at Atieva's Casa Grande, Arizona plant.

119.    CW5 explained the problems and delays with the Casa Grande plant in December 2020 to class counsel. CW5 estimated that "50%" of the plant's equipment was not complete. CW5 believed that by the time his tenure ended in December 2020, that the plant would take 4 or 5 months for construction to be complete. Class counsel asked CW5 if he believed Atieva could begin production in Spring 2021, and CW5 replied that he did not believe that Atieva would be able to start production in Spring 2021, stating that "the managers knew this" as well.

120.    In interviews with class counsel, CW5 stated that the Body-In-White ("BIW") section of the plant was not complete in that it was still having equipment installed, which he was aware of because he went over to BIW from the General Assembly area he worked in, to occasionally check on its progress. CW5 stated that in the General Assembly area that "nothing was done," equipment was missing and had to get installed and up-and-running, and that the robots that would conduct assembly were missing. CW5 described the General Assembly area as "chaos" when his tenure ended in December 2020.

121.    In interviews with class counsel, CW5 further recalled examples of the unfinished condition of the plant as of the end of his tenure in December 2020. CW5 stated that the ten-foot doors that roll up and down to let cars in and out of the plant were not operational. CW5 stated that machine rollers used to align cars were not ready, that testing equipment was not on hand, and that conveyors used to move cars from BIW to General Assembly were still being installed when his tenure ended. CW5 stated that machines used to install fluids, such as wiper fluid and antifreeze, were not available. CW5 stated that the dynamometer(s) did not work and that the Automatic Guided Vehicles ("AGV") systems, which he stated are programmed to move cars from one station to another, were not programmed properly. CW5 stated that the AGV tracking routing lines that are planned and laid out on the factory floors needed to be reprogrammed so that their optical eyes could properly track those lines. CW5 further stated that the compressed air lines and other piping were installed and were needed to run other equipment in the plant. CW5 also stated that even the bathrooms were not yet built.

122.    **CW6.** Counsel in the Securities Class Action also interviewed an individual employed at the plant in Casa Grande, Arizona as a member of the Electrical Maintenance Team from Fall 2020 to Summer 2021 ("CW6"). CW6 worked as part of the maintenance team in the General Assembly area, and his responsibilities included maintaining the tools and equipment used in assembling cars, including the Air. CW6 stated that he reported to General Assembly Maintenance Supervisor Jeremiah Johnson, who reported to maintenance supervisor Donald Waldman, who reported to the plant's General Manager.

123.    In interviews with counsel in the Securities Class Action, CW6 stated that there were monthly company-wide "all-hands" video conference calls that upper management from Atieva's headquarters participated in, and that during these call, the delays were frequently discussed and that these delays would impact Atieva's SOP date. CW6 added that the SOP date had been repeatedly pushed out throughout his tenure and stated that as of "January or February" 2021, and before the Merger with CCIV was formally announced, the SOP date had been pushed from its earlier Spring 2021 date to October 2021.

124.    CW6 further stated in interviews with class counsel that issues with the supply of materials and parts that Atieva needed for production had contributed to the delays. CW6 stated that testing, along with trial and error, showed that certain parts needed to be reworked or reengineered. CW6 also recalled

that by the time he left, the General Assembly department was still unfinished, and he and his colleagues were identifying problems with parts. CW6 stated that in General Assembly, things were still not commissioned and approved by the time his tenure ended.

125.   **CW7.** Counsel in the Securities Class Action also interviewed an individual that worked at Atieva's Newark, CA facility from January 2021 until at least the Summer of 2021. CW7's job involved testing the Lucid Air's electric motor and drivetrain, which are essentially a combined part. Most of his time at Lucid was spent testing "Alpha," "Beta," and production motors.

126.   In interviews with class counsel, CW7 stated that the Alpha and Beta motors being worked on in February through late Spring-to-early Summer were being hand built at the Newark, California facility. CW7 stated that when he started at Atieva in January 2021, Atieva was still working on and testing the "Alpha" version of the motor. At the time, the motor was not yet at the point where it was ready for production in a deliverable vehicle. CW7 stated that in February 2021, he began working on the next versions of the motor, "Beta 1." At the time, in February, the Beta 1 motor was "still not 100 percent there." The next version, "Beta 2," was ready sometime in mid-March to April 2021. CW7 stated that a production-ready version of the motor was not ready until about July 2021.

127.   In interviews with class counsel, CW7 stated that in February 2021 and continuing during the following months, Atieva was still in the process of finding new suppliers for parts that would be ultimately used to assemble the car at the Casa Grande, Arizona facility.

128.   CW7 further stated in interviews with class counsel that, as of February 2021, he would not have thought it possible to make 6,000 cars by the end of the year. CW7 stated that, in February 2021, when Atieva claimed it could deliver its first cars in the spring and make 6,000 cars by the end of the year, Atieva's factory in Casa Grande, Arizona was not yet capable of producing motors for the car. CW7 stated that the Arizona line did not start producing motors for his team to start testing until late spring or early Summer 2021. CW7 stated that those first motors from the factory, however, had quality problems, that had to do with the "durability" of the motors, which is something his team tested. CW7 stated that the motors "were almost non-functioning" and that "stuff would come from the factory, and it wasn't close to the standard we wanted."

### **False and Misleading Statements Made During the Relevant Period**

***February 5, 2021 Television Appearance***

129.     On February 5, 2021, Defendant Rawlinson appeared on a program on CNBC called *Squawk on the Street*, and discussed Atieva, the market for electric vehicles, and other aspects of Atieva's business, operations, and prospects, including rumors of a SPAC deal.[10]

130.     During the interview, Defendant Rawlinson stated that it was "absolutely right" that Atieva expected to produce 6,000-7,000 units of the Lucid Air in 2021, indicating that Atieva was close to launching the car. He further stated that Ateiva had "already built our first phrase of our factory in Arizona, which is good for 34,000 units."

131.     The statements in the February 5, 2021 interview were materially false and misleading. In particular, Defendant Rawlinson's comments: (1) supported the notion that Atieva would produce 6,000-7,000 cars in 2021; (2) emphasized that the Company had a fully functioning factory; (3) implied that Atieva was close to shifting focus to the next phases of production; (4) conveyed to investors that Atieva had the ability to manage major logistical challenges; and (5) indicated that the Lucid Air was developed and ready for SOP, since the factory could not be "already built" or "fully commissioned" unless the factory was prepared to construct the vehicle.

132.     In addition to making the foregoing statements, Defendant Rawlinson's statements during the February 5, 2021 television appearance were supported by a graphic, which claimed that the Arizona factory was "now built" and "fully commissioned," with "Capacity 34,000 units." Defendant Rawlinson did not correct these statements, and they were therefore made by him. The statements in the supporting graphic were materially false and misleading for the reasons discussed in the foregoing paragraph.

133.     Following the February 5, 2021 interview, and on the same day, Atieva's Twitter account posted a link to the interview, thereby endorsing the statements therein.

134.     The February 5, 2021 interview had the effect of increasing CCIV's stock price. Specifically, on February 5, 2021, CCIV's stock price opened at $30.90 and closed at $34.65, a daily

---

[10] https://www.cnbc.com/video/2021/02/05/watch-cnbcs-full-interview-with-lucid-motorsceo-peter-rawlinson.html

increase of 12.13%.

### *February 12, 2021 Video Appearance*

135.     On February 12, 2021, CNBC published a video of Defendant Rawlinson in an article titled "first look inside Lucid Motors' new factory in Casa Grande, Arizona." In the video, Defendant Rawlinson stated, "right behind me we're doing the pre-production run – the release candidates for Lucid Air Dream Edition, which we're launching this year, this Spring."

136.     The statement in the foregoing paragraph was materially false and misleading because Atieva had already pushed the production schedule for the Lucid Air to October 2021, as explained in class counsel's interviews with CW6 in which CW6 stated that, as of "January or February" 2021, the SOP date had been pushed to October 2021. Furthermore, the statement indicated that Atieva would begin production on the Lucid Air in the spring of 2021, without disclosing risks that made such a date not feasible. Moreover, Defendant Rawlinson failed to correct his previous statements that it was "absolutely right" that Atieva expected to produce 6,000-7,000 vehicles in 2021.

137.     The statements referenced in ¶¶ 129–36 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Atieva Defendants willfully or recklessly made and/or caused Atieva to make false and misleading statements that failed to disclose, *inter alia*: (1) Atieva was unable to produce or deliver vehicles in spring 2021; (2) the true timetable for production and delivery of the Lucid Air; (3) Atieva was not reasonably likely to produce 6,000-7,000 cars in 2021. As a result of the foregoing, Atieva's public statements regarding the Lucid Air were materially false and misleading at all relevant times.

### **The Truth Emerges**

138.     On February 22, 2021, after trading hours, Atieva and CCIV issued a joint press release with information concerning the Merger. The press release stated that a copy of an investor presentation could be found on Atieva's investor page. The press release and investor presentation were filed with the SEC in the evening of February 22, 2021.

139.     The investor presentation included a slide which disclosed that, instead of 6,000-7,000 Airs, the Company would produce only 577 Airs in 2021. This revision amounted to a decrease of over

90% from earlier statements. It further demonstrated that Atieva was not positioned to begin producing the vehicle, contrary to previous statements concerning its factory being "already built," "fully commissioned," and "good for 34,000" units of the Air per year. The slide is displayed below:

FINANCIAL OVERVIEW

## Summary P&L

($ Million)

| | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|---|
| **Total Volume** | 577 | 20,157 | 48,896 | 89,847 | 135,347 | 251,281 |
| % Growth | NA | NM | 142.6% | 83.8% | 50.6% | 85.7% |
| **Total Revenue** | $97 | $2,219 | $5,532 | $9,931 | $13,985 | $22,756 |
| % Growth | NM | NM | 149.4% | 79.5% | 40.8% | 62.7% |
| COGS | ($252) | ($2,185) | ($4,384) | ($7,805) | ($10,889) | ($17,476) |
| **Gross Profit** | ($155) | $34 | $1,149 | $2,125 | $3,096 | $5,280 |
| EBIT | ($1,494) | ($1,361) | ($1,026) | ($150) | $637 | $1,768 |
| **EBITDA** | ($1,389) | ($1,090) | ($637) | $592 | $1,671 | $2,885 |
| Capital Expenditures | ($877) | ($1,342) | ($1,917) | ($1,784) | ($774) | ($573) |
| % of Revenue | 902.8% | 60.5% | 34.7% | 18.0% | 5.5% | 2.5% |
| **Free Cash Flow** | ($2,312) | ($2,759) | ($3,250) | ($1,485) | $321 | $1,515 |

Note: EBIT, EBITDA and Free Cash Flow are non-GAAP financial measures and should not be considered in isolation or as alternatives to measures derived in accordance with GAAP. See slide 68 for reconciliations.

LUCID | CHURCHILL CAPITAL

67

140.    In addition, a slide in the investor presentation further stated that production would begin in the second half of 2021, not in Spring 2021, as had previously been touted. This slide is displayed below:

MANUFACTURING

## Lucid has built the first state-of-the-art, greenfield EV manufacturing facility in North America.



Our Advanced Manufacturing Plant (AMP-1) in Casa Grande, Arizona is scheduled to begin production in 2H 2021.

Built with strong incentives package and excellent support from government team.

By building the facility from a clean slate and leveraging our decades of previous experience from Tesla, Audi and more, we expect to achieve:

- Greater capital efficiencies
- Greater operational efficiencies
- Consistent production quality

Three key activities take place within AMP-1:

- Body shell manufacture
- Painting of body shells
- General assembly



LUCID | CHURCHILL CAPITAL

51

141.    On February 23, 2021, a video of the investor presentation was posted to Atieva's website.

142.    On February 23, 2021, before trading hours defendant Rawlinson was interviewed by Jim Cramer and David Faber on CNBC. During the interview, Defendant Rawlinson that "what we need to do now is humbly and diligently execute and ***get this into production.***" (Emphasis added.)

143.    Also on February 23, 2021, representatives from Atieva and CCIV hosted a call regarding the Merger. During the call, Defendant Rawlinson attributed the delay to the need to improve the quality of Atieva's vehicles, stating, "We're only going to start production when we get that quality spot on." Defendant Rawlinson thereby admitted that Atieva's factory was not actually "already built," as previously stated. Defendant Rawlinson also stated that they were still only "building our pre-production cars" at the Casa Grande plant.

144.    On February 23, 2021, during trading hours, Defendant Rawlinson was interviewed on *Bloomberg Television*. During the interview, Defendant Rawlinson was asked, "You've delayed production until the second half of 2021. You said it would — deliveries of Lucid Air would start in the Spring. What's behind that delay?"  Defendant Rawlinson stated that CCIV's Alan Mulally told him to "get the product right" and not to "work to the artificial construct of a specific date." Rawlinson also stated

that the deal with CCIV had "freed" him from the need to articulate a date for SOP. He further stated that Atieva was "chasing down a number of supplies from around the world."

145.    The revelations that Atieva would produce only 577 Airs in 2021 and that production would not begin until the second half of 2021 caused the price per share of CCIV's stock to tank. After closing at $57.37 on February 22, 2021, the stock closed at $35.21 on February 23, 2021, a loss of more than 38.6%. The stock price further declined on February 24, 2021, closing at $28.70. Thus, over two days, CCIV's stock price fell approximately 50%.

## DEVELOPMENTS AFTER THE RELEVANT PERIOD

146.    The Company began production on or around September 28, 2021. On October 30, 2021, the Company finally delivered the first Lucid Air vehicles to customers.

147.    Before trading hours on December 6, 2021, the Company filed a Form 8-K with the SEC disclosing that it had received a subpoena from the SEC on December 3, 2021. The December 6, 2021 Form 8-K stated that, "Although there is no assurance as to the scope or outcome of this matter, the investigation appears to concern the business combination between the Company (f/k/a Churchill Capital Corp. IV) and Atieva, Inc. *and certain projections and statements*." (Emphasis added.) The Company added that it was "cooperating fully with the SEC in its review."

148.    On December 7, 2021, a Form 4 was filed with the SEC, stating that Defendant Rawlinson disposed of 466,749 shares of Lucid on December 6, 2021 at a price of $47.27. A footnote in the Form 4 stated: "Represents shares withheld to cover payment of the tax liabilities of the reporting person related to the vesting of a portion of the reporting person's restricted stock unit award that was granted on July 23, 2021 and was previously reported." Notably, the price of $47.27 was the closing price of the Company's stock on Friday, December 3, 2021, the day the Company received the SEC subpoena and before the subpoena became public knowledge. Thus, Defendant Rawlinson's insider transaction on December 6, 2021 was effected at a price that was artificially inflated due to the public's lack of awareness of the SEC subpoena.

149.    On December 8, 2021, the Company announced an intention to offer $1.75 billion in convertible senior notes due 2026. This round of funding came much sooner than had been forecasted by

Defendant Rawlinson, who had stated that the funding received in the Merger "sees us through to the end of 2022." Upon this news, the Company's stock price fell from its close price of $44.72 on December 8, 2021 to close at $36.52, a decline of $8.20, or approximately 18.3%.

## DAMAGES TO LUCID

150.     As a direct and proximate result of the Individual Defendants' misconduct, Lucid has lost and will continue to lose and expend many millions of dollars.

151.     Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against Atieva and Defendant Rawlinson, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants, including the $2 million transaction bonus Defendant Rawlinson received in recognition of his efforts on the Merger and the special equity grant of 11,293,177 restricted stock units of Atieva he received that converted into an equivalent award with respect to the Company's common stock after the merger.

153.     Furthermore, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments the Individual Defendants received in connection with the Merger, including the Company's payment of the Merger Consideration to shareholders of Atieva.

154.     As a direct and proximate result of the Individual Defendants' conduct, Lucid has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations alleged herein and Defendant August's breaches of fiduciary duties, the Atieva Defendants' aiding and abetting thereof, and the Individual Defendants' unjust enrichment.

## DERIVATIVE ALLEGATIONS

155.     Plaintiff brings this action derivatively and for the benefit of Lucid to redress injuries suffered, and to be suffered, as a result of Defendant August's breaches of his fiduciary duties as a directors of CCIV, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting of the foregoing by the Atieva Defendants, as well as the Individual Defendants' unjust enrichment. In addition,

this action seeks contribution under Sections 10(b) and 21D of the Exchange Act.

156.     Lucid, the parent company of Atieva, is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

157.     Plaintiff is, and has been at all relevant times, a shareholder of Lucid. Plaintiff will adequately and fairly represent the interests of Lucid in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

158.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

159.     A pre-suit demand on the Board of Lucid is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants August, Liveris, Posawatz, and Rawlinson (the "Director-Defendants") and non-parties Turqi Alnowaiser ("Alnowaiser"), Nancy Gioia ("Gioia"), Frank Lindenberg ("Lindenberg"), Nichelle Maynard-Elliot ("Maynard-Elliot"), and Janet S. Wong ("Wong") (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of nine Directors who are on the Board at the time this action is commenced.

160.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause Atieva to make false and misleading statements and omissions of material facts while failing to disclose the truth and failing to correct the false and misleading statements and omissions of material facts, or to fail to disclose and/or cause CCIV to fail to disclose the truth or correct the false and misleading statements and omissions of material facts.

161.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make CCIV appear more profitable and attractive to investors. Moreover, Director-Defendant August caused CCIV to fail to maintain internal controls. As a result of the foregoing, Director-Defendant August breached his

fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and demand upon him is futile, and thus excused. Director-Defendants Liveris, Posawatz, and Rawlinson aided and abetted Director-Defendant August's breaches of fiduciary duties, and they therefore face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

162.    Additional reasons that demand on non-party Alnowaiser is futile follow. Alnowaiser is the Deputy Governor and Head of the International Investments Division at the PIF of the Kingdom of Saudi Arabia, one of the largest sovereign wealth funds in the world. He previously served at the PIF as Head of International Investments and as Senior Advisor. He also previously served in executive roles at Saudi Fransi Capital, a financial services firm based in Saudi Arabia. Alnowaiser served as a member of Atieva's board of directors from April 2019 until the Merger, after which he has continued to serve as a director of Lucid. Alnowaiser has shared voting power with respect to Ayar Third Investment Company ("Ayar"), an affiliate of PIF, which was the majority shareholder of Atieva and which, as of July 23, 2021, owned 62.7% of the Company's common stock. Thus, Alnowaiser had substantial control of Atieva during the period when the Atieva Defendants made or caused Atieva to make false and misleading statements. Moreover, Alnowaiser served as a director of Atieva throughout the Relevant Period, during which Atieva issued the false and misleading statements discussed herein. Indeed, Alnowaiser profited from the Merger, including by being a shareholder of Atieva when the Merger Consideration was paid, making it unlikely he would initiate any investigation into the misconduct alleged herein, which pertains to conduct regarding the Merger prior its consummation. Alnowaiser also served on a special committee of Atieva that considered whether to pursue the Merger Agreement and Merger. For these reasons, non-party Alnowaiser aided and abetted Defendant August's breaches of fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant August is futile follow. Defendant August served as a director of CCIV during the Relevant Period and is currently a member of the Lucid's Board. As a trusted director of CCIV, he conducted little, if any, oversight of the scheme in which the Atieva Defendants made or caused Atieva to make false and misleading statements and in which he failed to correct the false and misleading statements and failed to disclose the truth. Defendant August has an

economic interest in shares of the Company's common stock and certain private placement warrants through his control and partial ownership of an entity, OHA Partner Global Co-Investment III, LLP, which owns membership interests in Churchill Sponsor IV LLC ("Sponsor"), a Delaware limited liability company in which certain of CCIV's directors and officers hold membership interests. Defendant August consciously disregarded his duties to monitor CCIV's internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant August breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on non-party Gioia is futile follow. Gioia became a member of the Company's Board in July 2021. She previously served in various leadership positions at Ford Motor Company for over thirty years. Gioia was an operating partner of Sponsor and was a consultant to CCIV in evaluating the transactions contemplated by the agreement to merge in July 2021. Gioia also has a substantial economic interest in shares of CCIV's common stock and warrants through her ownership of membership interests in Sponsor, which beneficially owned 5.9% of the Company's common stock as of July 23, 2021. In connection with her appointment and service as a Company director, Gioia forfeited certain pension benefits from a prior employer in the amount of approximately $3.3 million. As compensation for such forfeiture, CCIV agreed to pay Gioia $2 million in cash and an affiliate of Sponsor agreed to issue Gioia indirect membership interests in it, which represent 100,000 shares of Company common stock. Thus, as the Company admits, Gioia is a non-independent director. Due to her involvement as a consultant on the Merger and due to the compensation she received for her appointment and service on the Board, Gioia is unable to disinterestedly investigate the scheme described herein. Thus, she is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Liveris is futile follow. Defendant Liveris served as a director and Chairman of Atieva throughout the Relevant Period and until the Merger, after which he served as a director and as Chairman of the Board at Lucid. In addition, according to the June 25, 2021 Prospectus, Defendant Liveris was an operating partner of Sponsor. Thus, Defendant Liveris served a crucial link between Atieva and Sponsor, and therefore CCIV. Defendant Liveris has a substantial

economic interest in shares of the Company's common stock through his ownership of membership interests in the Sponsor, which beneficially owned 5.9% of the Company's common stock as of July 23, 2021. Despite being a trusted leader at both Atieva and Sponsor, Defendant Liveris aided and abetted the scheme described herein, in which the Atieva Defendants made or caused Atieva to make false and misleading statements and in which Defendant August failed to correct the false and misleading statements and failed to disclose the truth. Moreover, Defendant Liveris profited from the Merger, including by being a shareholder of Atieva when the Merger Consideration was paid, making it unlikely he would initiate any investigation into the misconduct alleged herein, which pertains to conduct regarding the Merger prior its consummation. For these reasons, Defendant Liveris aided and abetted Defendant August's breaches of fiduciary duties, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Posawatz is futile follow. Defendant Posawatz served as a member of Atieva's board of directors from April 2019 until the Merger, after which he has served as a member of Lucid's Board. For the year ended December 31, 2020, Defendant Posawatz received $157,895 in compensation from PIF, an affiliate of Ayar, for his service on the board of directors of Atieva. Thus, he is closely linked to a controlling shareholder of the Company, Ayar, as well as to non-party Alnowaiser. Defendant Posawatz served on a special committee of Atieva that considered whether to pursue the Merger Agreement and Merger, and he therefore played a significant role in the Merger Agreement. Defendant Posawatz has a substantial economic interest in shares of the Company's common stock through his ownership of membership interests in the Sponsor, which beneficially owned 5.9% of the Company's common stock as of July 23, 2021. Despite being a trusted leader at Atieva, Defendant Posawatz aided and abetted the scheme described herein, in which the Atieva Defendants made or caused Atieva to make false and misleading statements and in which Defendant August failed to correct the false and misleading statements and failed to disclose the truth. Moreover, Defendant Posawatz profited from the Merger, including by being a shareholder of Atieva when the Merger Consideration was paid, making it unlikely he would initiate any investigation into the misconduct alleged herein, which pertains to conduct regarding the Merger prior its consummation. For these reasons, Defendant Posawatz aided and

abetted Defendant August's breaches of fiduciary duties, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Rawlinson is futile follow. Defendant Rawlinson served as CEO and CTO of Atieva before and during the Relevant Period, and he continues to serve in those positions at Lucid. Thus, as the Company admits, Defendant Rawlinson is a non-independent director. Defendant Rawlinson received a $2 million transaction bonus in recognition of his efforts related to the merger between Atieva and CCIV, as well as a special equity grant of 11,293,177 restricted stock units of Atieva, and he served on a special committee of Atieva that considered whether to pursue the Merger Agreement and Merger. Most critically, Defendant Rawlinson himself issued false and misleading statements to the effect that production and customer deliveries of the Lucid Air would begin in spring 2021, and that Atieva expected to produce 6,000-7,000 vehicles in 2021. Moreover, as evidenced by the statements of confidential witnesses interviewed by counsel in the Securities Class Action, Defendant Rawlinson knew that his statements touting certain vehicle production and delivery metrics were false. The Company provides Defendant Rawlinson with his principal occupation, and he has received significant payments and compensation in connection with his position, as described above. As Atieva's highest officer and as a trusted Atieva director, he played a crucial role in the scheme described herein, and aided and abetted Defendant August's breaches of fiduciary duties. Moreover, Defendant Rawlinson is a defendant in the Securities Class Action. For these reasons, Defendant Rawlinson faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on the Board is futile follow.

169. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, during the Relevant Period Defendant Liveris served at both Atieva, as a director, and CCIV, as an Operating Partner. Thus, he was a colleague of Defendant August during the time when he was breaching his fiduciary duties, and as a director of Atieva and an Operating Partner at CCIV, he aided and abetted Defendant August's breaches of fiduciary duties. Defendant Liveris

is therefore unable to disinterestedly investigate the allegations herein, which are directed at his professional colleagues at CCIV and affiliated entities. In addition, Defendant August and Director Gioia both held membership interests in Sponsor, which beneficially owned 5.9% of the Company's common stock as of July 23, 2021. Therefore, they together have substantial economic interests in CCIV due to Sponsor's interest in CCIV. Thus, Defendant August and director Gioia are unlikely to pursue any action against one another. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Board would be futile.

170.   Defendant August served as a member of CCIV's Audit Committee throughout the Relevant Period. Pursuant to the CCIV's Audit Committee Charter, Defendant August was responsible for, *inter alia*, overseeing the accounting and financial reporting processes of CCIV and reviewing and taking steps to remedy any deficiencies with CCIV's system of internal controls. Defendant August failed to adequately oversee CCIV's reporting processes, failed to identify or remedy deficiencies with CCIV's internal controls, and failed to cause CCIV to prevent the issuance of false and misleading statements. Thus, Defendant August breached his fiduciary duties, is not disinterested, and demand is excused as to him.

171.   Demand in this case is further excused because certain Directors are beholden to and controlled by Ayar, an affiliate of PIF. Specifically, as of July 23, 2021, Ayar owned approximately 62.7% of the Company's outstanding common stock; non-party Alnowaiser, as Deputy Governor and Head of the International Investments Division at the PIF, has shared voting power with respect to these shares. Ayar also has the ability to nominate five of the Company's nine directors. Ayar nominated Defendants Liveris and Posawatz to the Board, as well as non-parties Alnowaiser, Lindenberg and Maynard-Elliot (collectively, the "Ayar Directors"). Moreover, Defendant Posawatz was paid by Ayar in 2020 for his service on Atieva's board of directors, and Defendant Liveris has served as a special adviser to PIF.  In light of Ayar's control of the Ayar Directors, who constitute a majority of the Board, the Board cannot impartially investigate the wrongdoing alleged herein. None of the Ayar Directors can impartially consider whether to take action against Defendants Liveris or Posawatz because the Ayar Directors are dependent

on Ayar for their continued employment with the Company and associated compensation, and cannot be expected to initiate an investigation that could implicate Defendants Liveris or Posawatz, who are affiliated with PIF. Thus, the Ayar Directors, who together constitute a majority of the Board, are unable to evaluate a demand with disinterest or independence, and demand is excused as to them.

172. In violation of the Code of Conduct, Defendant August conducted little, if any, oversight of the scheme described herein, in which the Atieva Defendants made or caused Atieva to make false and misleading statements and in which Defendant August failed to correct the false and misleading statements and failed to disclose the truth. The scheme had the purpose of facilitating and disguising Defendant August's violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, the Atieva Defendants' aiding and abetting of the foregoing, and the Individual Defendants' unjust enrichment. In further violation of the Code of Conduct, Defendant August failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, Director-Defendant August faces a substantial likelihood of liability and demand is futile as to him.

173. Lucid has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Lucid any part of the damages Lucid suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

174. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of Directors either face a substantial likelihood of liability or are not independent, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

Accordingly, demand is excused as being futile.

175.     The acts complained of herein constitute violations of fiduciary duties owed by Defendant August and the aiding and abetting thereof, and these acts are incapable of ratification.

176.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Lucid. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers or directors of Lucid or its predecessor entities, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

177.     If there is no directors' and officers' liability insurance, then the Directors will not cause Lucid to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

178.     Thus, for all of the reasons set forth above, a majority of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendant August for Breach of Fiduciary Duties

179.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.     Defendant August owed to CCIV the duty to exercise candor, good faith, and loyalty in the management and administration of CCIV's business and affairs.

181.     Defendant August violated and breached his fiduciary duties of candor, good faith, loyalty,

reasonable inquiry, oversight, and supervision.

182.   Defendant August's conduct set forth herein was due to his intentional or reckless breach of the fiduciary duties he owed to the CCIV, as alleged herein. He intentionally or recklessly breached or disregarded his fiduciary duties to protect the rights and interests of CCIV.

183.   Defendant August knew, or was highly reckless in not knowing, that Atieva's public statements regarding the Lucid Air were materially false and misleading. Moreover, Defendant August knew, or were highly reckless in not knowing, that the investing public was aware of talks between CCIV and Atieva to merge. However, despite this knowledge, Defendant August willfully or recklessly failed to disclose and/or caused CCIV to fail to disclose, *inter alia*: (1) Atieva was unable to produce or deliver vehicles in spring 2021; (2) Atieva was not reasonably likely to produce 6,000-7,000 vehicles in 2021; (3) the true timetable for production and delivery of the Lucid Air; and (4) CCIV failed to maintain internal controls. Thus, during the Relevant Period, Defendant August breached his fiduciary duties to CCIV by failing to correct or causing CCIV to fail to correct the false and misleading statements issued by Atieva regarding the timetable for the production and delivery of the Lucid Air, a material issue to CCIV investors given the forthcoming Merger. The investing public's reliance on the news of the anticipated Merger and Atieva's or the Atieva Defendants' statements regarding a spring 2021 timetable for the production and delivery of the Lucid Air caused CCIV's share price to be artificially inflated and harmed CCIV.

184.   Defendant August failed to correct and/or caused CCIV to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders him personally liable to the Company for breaching his fiduciary duties which he owed to CCIV.

185.   Also in breach of his fiduciary duties, Defendant August caused the Company to fail to maintain internal controls.

186.   Defendant August had actual or constructive knowledge that he had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. He had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that he caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate

internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CCIV's securities. Defendant August, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

187.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

188.    As a direct and proximate result of Defendant August's breaches of his fiduciary obligations, Lucid has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendant August is liable to the Company.

189.    Plaintiff on behalf of Lucid has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lucid.

192.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Lucid that was tied to the performance or artificially inflated valuation of CCIV, or received compensation or other payments, including compensation or other payments made in connection with the Merger, that were unjust in light of the Individual Defendants' bad faith conduct.

193.    Plaintiff, as a shareholder and a representative of Lucid, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct, breach of their fiduciary and/or contractual duties, or the aiding and abetting thereof.

194.   Plaintiff on behalf of Lucid has no adequate remedy at law.

## THIRD CLAIM

### Against Defendant August for Abuse of Control

195.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.   Defendant August's misconduct alleged herein constituted an abuse of their ability to control and influence Lucid, for which they are legally responsible.

197.   As a direct and proximate result of Defendant August's abuse of control, Lucid has sustained significant damages. As a result of the misconduct alleged herein, Defendant August is liable to the Company.

198.   Plaintiff on behalf of Lucid has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendant August for Gross Mismanagement

199.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.   By his actions alleged herein, Defendant August, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CCIV in a manner consistent with the operations of a publicly-held corporation.

201.   As a direct and proximate result of Defendant August's gross mismanagement and breaches of duty alleged herein, Lucid has sustained and will continue to sustain significant damages.

202.   As a result of the misconduct and breaches of duty alleged herein, Defendant August is liable to the Company.

203.   Plaintiff on behalf of Lucid has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendant August for Waste of Corporate Assets

204.   Plaintiff incorporates by reference and realleges each and every allegation set forth above,

as though fully set forth herein.

205.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendant August has caused CCIV to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

206.    As a result of the waste of corporate assets, Defendant August is liable to the Company.

207.    Plaintiff on behalf of Lucid has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendant Rawlinson for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    Atieva and Defendant Rawlinson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Rawlinson's willful and/or reckless violations of his obligations as an officer of Atieva.

210.    Defendant Rawlinson because of his position of control and authority as CEO of Atieva, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Atieva, including the wrongful acts complained of herein and in the Securities Class Action.

211.    Accordingly, Defendants Rawlinson is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

212.    As such, Lucid is entitled to receive all appropriate contribution or indemnification from Defendant Rawlinson.

## SEVENTH CLAIM

**Against the Atieva Defendants for Aiding and Abetting Breach of Fiduciary Duty**

213.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214.   The Atieva Defendants aided and abetted Defendant August who breached his fiduciary duties to CCIV.

215.   The Atieva Defendants' misconduct resulted in continuous, connected, and ongoing harm to CCIV.

216.   The Atieva Defendants controlled Atieva, Lucid's functional and operational predecessor, and made or caused Atieva to make statements and issue press releases that contained materially false and misleading statements promoting Atieva's business, operations, and prospects, particularly as related to production and customer deliveries of the Lucid Air. Specifically, the Atieva Defendants made or caused Atieva to make false and misleading statements touting that production and customer deliveries of the Lucid Air would begin in spring 2021. This misconduct aided and abetted Defendant August's breaches of duty alleged herein.

217.   The Atieva Defendants are jointly and severally liable to the same extent as the CCIV are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

218.   As a direct and proximate result of the Atieva Defendants' aiding and abetting of Defendant August's breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

219.   Plaintiff on behalf of Lucid has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Lucid, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that Defendant August has breached his fiduciary duties to the Company

and the Atieva Defendants have aided and abetted Defendant August's breaches of fiduciary duties;

   (c) Determining and awarding to Lucid the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

   (d) Directing Lucid and the Individual Defendants to take all necessary actions to reform and improve Lucid's corporate governance and internal procedures to comply with applicable laws and to protect Lucid and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

    2. a provision to permit the shareholders of Lucid to nominate at least five candidates for election to the Board;

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

   (e) Awarding Lucid restitution from Individual Defendants, and each of them;

   (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

   (g) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

1   Dated: January 26, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Sahr Lebbie, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1/25/2022 __ day of January, 2022.

DocuSigned by:

*Sahr Lebbie*

9CB23D5B3330462...

Sahr Lebbie